UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
S.S. and E.S., on behalf of K.S.,

                                        Plaintiffs,

        - against -

KATONAH LEWISBORO UNION FREE
SCHOOL DISTRICT and DR. RAYMOND
BLANCH,

                                        Defendants.
-------------------------------------------------------------x

**OPINION & ORDER**

No. 24-CV-9267 (CS)

Appearances:

Steven J. Alizio
Justin B. Shane
Hope Turbert
The Law Office of Steven Alizio, PLLC
New York, New York
*Counsel for Plaintiffs*

Steven Banks
Daniel Petigrow
Cassidy Allison
Thomas, Drohan, Waxman, Petigrow & Mayle, LLP
Hopewell Junction, New York
*Counsel for Defendants*

Seibel, J.

        Before the Court are the cross-motions for summary judgment of Plaintiffs S.S. and E.S.

(collectively, "Plaintiffs" or the "Parents," and individually, the "Parent"), (ECF No. 42), and of

Defendants Katonah Lewisboro Union Free School District and Dr. Raymond Blanch

("Defendants" or "the District"), (ECF No. 24).  Plaintiffs bring this action on behalf of their

child, K.S. ("K.S." or the "Student"), pursuant to the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. §§ 1400 *et seq.*,[1] and corresponding state laws and regulations.  (ECF No. 16 ("SAC").)  Plaintiffs also bring claims under 42 U.S.C. § 1983, § 504 of the Rehabilitation Act of 1973 ("RA"), and Title II of the Americans with Disabilities Act of 1990 ("ADA").  (SAC ¶¶ 1, 138-153.)

For the following reasons, Plaintiffs' motion is DENIED, and Defendants' motion is GRANTED.

I.      **BACKGROUND**

The following facts are based on the parties' Local Civil Rule 56.1 Statements, (ECF No. 44 ("Ps' 56.1"); ECF No. 26 ("Ds' 56.1")), their responsive 56.1 Statements, (ECF No. 45 ("Ps' 56.1 Resp."); ECF No. 47 ("D's 56.1 Resp.")), and the administrative record,[2] and are undisputed unless otherwise noted.

A.      **Facts**

1.      **Background Prior to 2019**

Plaintiffs and K.S. have resided within the Katonah Lewisboro Union Free School District since 2019.  (Ps' 56.1 ¶¶ 2, 11; Ds' 56.1 ¶¶ 2, 6.)  Before moving to the district, K.S.

---

[1] The IDEA was amended in 2004 by the Individuals with Disabilities Education Improvement Act, Pub. L. No. 108-446, 118 Stat. 2647 (2004), but cases discussing the IDEA remain authoritative.

[2] The parties filed, under seal, the administrative decisions and the certified record of the impartial hearing, including the hearing transcripts and exhibits.  (ECF No. 23.)  While the hearing spanned six days and the transcript is divided into volumes for each day, the transcript pages are consecutively paginated, and the Court will therefore refer to the transcript ("Tr.") as a whole.  For purposes of this decision, the Parents' exhibits will be denoted by "PE," the District's exhibits will be denoted by "DE," and the exhibits of the Impartial Hearing Officer ("IHO") will be denoted by "IE."  In their filings, the parties refer to these documents using the red Bates numbers included on each page, rather than separating exhibits by number or letter as they were presented in the impartial hearing.  The Court will therefore use the same convention in citing to the parties' exhibits.  The decision of the State Review Officer ("SRO") will be denoted by "SD," and the IHO's decision will be denoted by "I."

attended elementary school in the Bedford Central School District ("Bedford"), where he was classified as a student with a disability.  (Ps' 56.1 ¶¶ 7-8; Ds' 56.1 ¶ 3.)  K.S.'s diagnoses include Autism Spectrum Disorder ("ASD"), Mood Disorder, Anxiety Disorder and Attention Deficit Hyperactivity Disorder ("ADHD").  (Ps' 56.1 ¶ 3.)  K.S. was first diagnosed with ASD when he was four years old, (*id.* ¶ 4; Tr. at 1025:6-23), and he became aware of the differences between himself and his classmates as early as fourth grade, at which point he began exhibiting symptoms of depression.  (Ps' 56.1 ¶ 9; Tr. at 1026:12-1027:2.)  In July 2019, he was admitted to the inpatient unit at Four Winds Hospital after episodes of mood instability, behavioral dysregulation and suicidal ideation.  (Ps' 56.1 ¶ 12; Ds' 56.1 ¶ 5; DE 176.)  Four Winds diagnosed K.S. with Disruptive Mood Dysregulation Disorder and ADHD in conjunction with his ASD, and K.S.'s psychiatrist later diagnosed him with Anxiety Disorder.  (Ps' 56.1 ¶ 13; DE 174, 193.)

While at Bedford, K.S.'s standardized test scores demonstrated that he had extremely high cognitive abilities.  (Ps' 56.1 ¶ 4.)  An assessment conducted in November 2016 indicated that K.S.'s IQ was in the 99th percentile and that he had above-average abilities in reading, writing and math.  (Ps' 56.1 ¶ 10; Ds' 56.1 ¶ 4; DE 127-28.)  K.S.'s processing speed, however, was only in the average range and was therefore a relative weakness.  (Ps' 56.1 ¶¶ 4, 10; DE 127-28.)  K.S.'s teacher also expressed concerns with his withdrawal, adaptability and social skills.  (Ps' 56.1 ¶ 10; DE 128-29.)

### 2.    2019-2020 IEP and School Year

In the fall of 2019, K.S. began his sixth-grade year at John Jay Middle School ("JJMS") in the District.  (Ps' 56.1 ¶ 15; Ds' 56.1 ¶ 7.)  He was placed in general education classes, but his Individualized Education Program ("IEP"), which was developed by the District's Committee on Special Education ("CSE"), provided him with both individual and small group counseling, each

once a week for thirty minutes.  (Ps' 56.1 ¶ 15; Ds' 56.1 ¶ 7; DE 149-50.)  The IEP noted that K.S. "ha[d] difficulty discussing and identifying his emotions," as well as "emotion dysregulation that can interfere with his ability to remain in class and follow school rules and routines."  (DE 154.)  To address these issues, the IEP included the following social/emotional/behavioral goals:  (1) "When prompted, the student will accurately identify his own emotions/feelings and the intensity of those emotions/feelings;" and (2) "The student will identify three distress tolerance and/or emotion regulation skills that he can use when he experiences emotion dysregulation."  (DE 155.)

 In crafting the IEP, the CSE considered K.S.'s discharge summary from Four Winds, which his parents provided to the District and which detailed his suicide attempts, and all documents related to his disabilities and diagnoses.  (Ps' 56.1 ¶ 12; Ds' 56.1 ¶ 8; DE 149-51; Tr. at 264:5-7, 265:19-266:13.)  JJMS's school psychologist, Dr. Sarah Fryd, had been granted permission to consult with K.S.'s private psychologist during the summer of 2019 to prepare for K.S.'s transition into JJMS, and she provided K.S. with evaluative and counseling services throughout the school year.  (Ds' 56.1 ¶¶ 10-11.)

Despite these measures, K.S. struggled with the transition.  (*See* P's 56.1 ¶ 16.)  In his first two months at JJMS, K.S. cried in class, eloped twice and received a detention.  (*Id.*)  By February 2020, K.S. had hit two District staff members and received an in-school suspension, in addition to crying in class and resisting school.  (*Id.* ¶ 17.)  K.S.'s parents enrolled him in Applied Behavior Analysis therapy in addition to his seeing a private psychologist.  (*Id.* ¶ 18; DE 199.)  K.S.'s teacher and school psychologist reported that K.S.'s episodes of emotional dysregulation decreased in frequency over the course of the school year, although the school psychologist noted that he "continue[d] to experience negative emotions and ha[d] difficulty

utilizing the strategies he ha[d] learned independently," and his parents noted that he "continue[d] to need significant social-emotional support." (DE 161; Ds' 56.1 ¶ 14; Ps'. 56.1 Resp. ¶ 14.) K.S.'s academic performance, however, was strong – his teachers reported that he contributed to classroom discussions, and he ultimately received grades of "A" or "A+" in all subjects, except for English Language Arts, in which he received a grade of "B+." (Ds' 56.1 ¶¶ 12-13; DE 149, 203.) He was ultimately able to achieve the first social-emotional/behavioral goal in his IEP, and his progress report indicated that his ability to identify his emotions and their intensity improved. (DE 228.) He also made progress toward the second goal, and his progress report noted that he was able to implement distress tolerance skills with support, although he still struggled to implement these skills independently in moments of dysregulation. (*Id.*)

### 3. 2020-2021 IEP and School Year

In order to develop an IEP for the 2020-2021 school year, the CSE convened on April 20, 2020, and conducted an annual review. (Ps' 56.1 ¶ 19; Ds' 56.1 ¶ 15.) During this meeting, the CSE discussed a triennial review that had been conducted during the school year, which involved a psychological evaluation conducted in November 2019 and quantitative testing administered in March 2020. (Ps' 56.1 ¶ 20; Ds' 56.1 ¶¶ 16-18.) These evaluations again found that K.S. exhibited very high intellectual functioning and strong skills in reading, writing and mathematics, (Ps' 56.1 ¶ 21; Ds' 56.1 ¶¶ 17-18; DE 163-64), but that his visual processing speed was a relative weakness, falling only in the average range, (Ps' 56.1 ¶ 21; DE 163). K.S.'s answers on the behavioral component of the psychological examination also resulted in "Clinically Significant" findings in several areas and subdomains, including "Locus of Control," "Social Stress," "School Problems," "Internalizing Problems," "Depression," "Atypicality," and "Self-Esteem." (Ps' 56.1 ¶ 22; DE 91.) His teachers' answers on the behavioral evaluation

indicated a "Clinically Significant" score for "Depression," as well as "At-Risk" scores for "Anxiety," "Atypicality," "Withdrawal," "Adaptability," and "Social Skills."  (Ps' 56.1 ¶ 22, DE 92.)  In terms of social development needs, the IEP noted that K.S. needed "to increase his awareness of his emotions and urges so that he can learn and apply strategies when he experiences emotion dysregulation," that he "would benefit from self-monitoring his own emotions and urges to increase this awareness and use of skills," and that he required counseling "to learn to identify other's [sic] perspectives in social situations."  (DE 166.)

K.S.'s IEP for the 2020-2021 school year therefore added a "Special Class 15:1+1 (Support and Skills)" for forty minutes four times per week, in addition to the weekly individual and small group counseling he had already been provided.  (Ps' 56.1 ¶¶ 23, 28; Ds' 56.1 ¶ 19; DE 168.)  Referred to by the District as a "learning lab," this special class included a maximum of fifteen students and was taught by one special education teacher and one member of the support staff (i.e., 15:1+1).  (Ps' 56.1 ¶ 24; Tr. at 180:2-17.)  This class, together with individual and group counseling where K.S. and other students were taught Dialectical Behavior Therapy ("DBT") skills,[3] constituted JJMS's "Therapeutic Support Program" ("TSP").  (Ps' 56.1 ¶ 24; Tr. at 32:3-20.)  K.S.'s parents agreed to this course of treatment.  (DE 162; Ps' 56.1 ¶ 25.)  The IEP also included the following social/emotional/behavioral goals:  (1) "When asked about hypothetical or real social situations, the student will identify how the other person feels and how

---

[3] "DBT is a type of cognitive behavioral therapy that teaches patients how to identify negative thinking patterns and change them while simultaneously helping them to accept that all their thoughts are valid because of who they are and the life experiences that they have had." *Simpson v. Comm'r of Soc. Sec.*, No. 22-CV-10606, 2024 WL 1300443, at *8 n.8 (S.D.N.Y. Mar. 26, 2024) (citing Stephanie Booth & Zilpah Sheikh, MD, *Dialectical Behavioral Therapy (DBT)*, WebMD (Feb. 28, 2024), https://www.webmd.com/mental-health/dialectical-behavioral-therapy)), *aff'd sub nom. Simpson v. Comm'r of Soc. Sec.*, No. 24-1104, 2025 WL 1156973 (2d Cir. Apr. 21, 2025) (summary order).

this feeling might impact the person's behavior;" and (2) "The student will complete a diary card to self-monitor his emotions, urges, and use of DBT skills throughout the week." (DE 167.)

Ultimately, K.S. concluded his seventh-grade year with final grades of B+ or higher in all subjects and was absent from school for no more than five days. (Ds' 56.1 ¶¶ 20-21; DE 207.) Psychologically, however, K.S. continued to struggle throughout the school year, feeling overwhelmed in the general education environment. (Ps' 56.1 ¶¶ 25-27; PE 302.) K.S. expressed suicidal ideation on at least one occasion, and had panic attacks and episodes of emotional dysregulation in school. (Ps' 56.1 ¶ 26; PE 9, 118, 147, 161-62, 255.) According to K.S.'s parents and his private psychologist, the stress became so great that in early 2021, K.S. even began experiencing hallucinations. (Ps' 56.1 ¶ 27; PE 141, 302; Tr. at 664:17-666:6, 1051:15-1053:8, 1123:6-12.) By later in the school year, however, his parents reported that he was "doing slightly better," and his private psychologist reported that the student's depression seemed to have lifted somewhat by the summer. (DE 28-29.) The school psychologist reported that he was "receptive to coaching when he experience[d] emotional dysregulation." (DE 29.) K.S. also achieved his first social/emotional/behavioral goal, as he had been able to "identify how the other person might feel and ha[d] identified how this feeling would impact the person's behavior." (DE 231.) While K.S. did not achieve his second social/emotional/behavioral goal, which required him to complete four out of five diary cards monitoring his emotions, urges and use of DBT skills, the progress report stated that he had completed three of the five diary cards tracking his emotions and urges. (Id.)

####            4.        2021-2022 IEP and School Year

On April 7, 2021, a Subcommittee on Special Education convened to develop K.S.'s IEP

for the 2021-2022 school year.  (Ps' 56.1 ¶ 30;[4] Ds' 56.1 ¶ 24; DE 2.)  Pursuant to the IEP, K.S.

was to remain in general education classes for all academic subjects, while continuing to receive

weekly individual counseling and the special "15:1+1" class four times weekly.  (Ps' 56.1 ¶ 32;

Ds' 56.1 ¶ 25; DE 2.)  The IEP also provided for continued small group counseling, but reduced

its frequency from once weekly to once monthly, as K.S. had already "completed two years of a

weekly skills group using the DBT model, and as such ha[d] graduated from this" and only

required group counseling to "reinforce and review the skills he ha[d] learned."  (DE 2-3; Ps'

56.1 ¶¶ 32-33; Ds' 56.1 ¶¶ 25-26.)

The "social development" portion of the IEP noted that while K.S. "continue[d] to need

support in developing and maintaining peer relationships," he was "friendly toward his peers"

and was "an active participant in both individual and group counseling."  (DE 6.)  It further

noted that K.S. "continue[d] to struggle with anxiety, feelings of anger, and stress," but

"experienced significantly less classroom interfering emotion dysregulation" than he had in the

prior year.  (*Id.*)  When experiencing dysregulation, K.S. was reported to be "open and receptive

to coaching" and could decrease dysregulation through mindfulness and distraction exercises

with support, but still struggled to implement these skills independently.  (*Id.*)  The IEP noted

that individual counseling was meant to "increase his awareness of his emotions and urges so

that he can apply strategies independently when he experiences emotion dysregulation."  (DE 7.)

---

[4] In Plaintiffs' 56.1 Statement, ¶ 28 is followed by a second ¶ 22, such that there are duplicates of paragraphs 22-28.  For ease of reference, the Court will refer to the paragraphs as they are sequentially renumbered in Defendants' 56.1 Counterstatement.

The IEP also included two social/emotional/behavioral goals.  (Ps' 56.1 ¶ 34; Ds' 56.1 ¶ 29; DE 8.)  The first social/emotional/behavioral goal provided that when K.S. "discusse[d] an instance of emotion dysregulation in counseling sessions, he w[ould] report having used one distress tolerance and/or emotion regulation skill to manage this."  (DE 8.)  The second addressed K.S.'s need for "support developing and maintaining peer connections and relationships" by requiring him to "report having used one socialization skill (i.e., initiating a conversation with peers, joining a club, making plans with friends) to foster his success regarding interpersonal relationships."  (DE 7-8.)  These skills were to be measured via a "[s]tructured interview" every two weeks.  (DE 8.)  Finally, the IEP provided that K.S. would receive certain accommodations in class, including being seated near the teacher; being permitted to take movement breaks; the use of a graphic organizer to enhance his ability to add details to his written work; receiving longer assignments in smaller components with interim due dates; and being asked to repeat directions or expectations back to ensure that he understood each step.  (DE 9.)

On July 13, 2021, the CSE reconvened at the request of K.S.'s parents, who were concerned about the increased stress that K.S. had experienced while transitioning back to in-person classes after the COVID pandemic.  (Ps' 56.1 ¶ 35; Ds' 56.1 ¶ 30; DE 14; Tr. at 142:10-143:4, 272:17-21.)  At this meeting, K.S.'s parents noted that they were considering placing K.S. at a BOCES school called Falls Academy, and the CSE Chairperson, while expressing the opinion that the program at JJMS was sufficient to meet K.S.'s needs, agreed to send a referral packet.  (Ps' 56.1 ¶ 35; DE 15-16; Tr. at 269:19-273:3.)  K.S.'s private psychologist and psychiatrist both felt that JJMS was not the proper environment for him and strongly recommended transfer.  (Tr. at 1057:10-14.)  Although K.S. was ultimately accepted to Falls

Academy, his parents chose to send him back to JJMS, as Falls Academy ended after eighth grade and they were concerned about how K.S. would handle the stress of multiple transitions in a row.  (Ps' 56.1 ¶ 36; Tr. at 274:18-275:11, 331:7-332:2; 1057:25-1059:15, 1077:3-13.)

After deciding that K.S. would continue attending JJMS, the parents reached out to the school to discuss additional goals that they wished to implement for the coming school year that were not already addressed by K.S.'s IEP, such as ensuring that K.S. was able to make new friends and have positive experiences at lunch and in clubs.  (Ps' 56.1 ¶ 37; DE 352-53.)  The school thus amended K.S.'s IEP on August 25, 2021 to add adult supervision at lunch as well as the following social/emotional/behavioral goal:  "When asked in individual counseling sessions, the student will report having attended at least one club that week or the prior week in order to increase his sense of social belonging."  (DE 27, 34-35; Ps' 56.1 ¶ 37; Ds' 56.1 ¶ 31.)  As with the other two social/emotional/behavioral goals, K.S.'s progress toward this goal was to be measured by "structured interview," (DE 34), which concerned the parents given that K.S. could inaccurately self-report participation in clubs without actually attending or participating, (DE 350; Ps' 56.1 ¶ 37).

To encourage K.S.'s attendance, the special education teacher and school psychologist created a club based on role-playing games with K.S. specifically in mind, hoping that his knowledge about and enthusiasm for these games would help him "build some currency to create some friendships."  (Tr. at 149:6-150:11; Ps' 56.1 ¶ 38; Ds' 56.1 ¶ 32.)  This effort was somewhat successful:  K.S. consistently attended the club once or twice per month and even began to meet with the group outside of school, (Ds' 56.1 ¶ 33; Tr. 56:23-59:24, 150:16-151:20), but his parents reported that he was more focused on playing the games than developing friendships, and that the meetings outside of school did not improve his social situation at school

because the children he met with were younger and in different grades, (Ps' 56.1 ¶¶ 38-39; Tr. at 1061:10-1062:25; PE 176).

On March 7, 2022, K.S.'s IEP was amended to remove the provision for adult supervision at lunchtime. (Ps' 56.1 ¶ 40; DE 223.) The CSE reported that this amendment was proposed because K.S. "consistently and appropriately socialize[d] at lunch with one of his peers, who he identifie[d] as a good friend, and thus no longer require[d] the support of adult supervision at lunch," (DE 223), but there is also evidence in the record that K.S. found the lunch aide "more embarrassing than helpful," (DE 252-53).

In addition to his struggles with making friends, K.S. also experienced bullying in his eighth-grade year, including an incident where a classmate tried to incite "another mental breakdown." (Ps' 56.1 ¶ 44; PE 7, 14.) K.S. also continued to experience depression, incidents of emotional dysregulation, and even suicidal thoughts, although he told the school psychologist that he was not planning to act on these thoughts. (Ps' 56.1 ¶¶ 43-44; PE 12, 179, 252.) And while K.S. maintained high grades in all subjects, (Ds' 56.1 ¶ 34; DE 210-11), he continued to report feeling burdened by his homework assignments, his general education teachers did not consistently comply with the homework modifications in his IEP, and he was absent from classes up to thirteen times, (Ps' 56.1 ¶ 46; DE 41, 210, 257; PE 12-13). Further, after experiencing chest pains and vomiting in March 2022, K.S. underwent an endoscopy and was diagnosed with gastritis and ulcers, which his doctors attributed to his constant stress and anxiety. (Ps' 56.1 ¶ 45; DE 191; Tr. at 666:7-19, 1044:24-1046:9.) K.S.'s private psychiatrist felt that a traditional high school environment could not reliably meet his academic and emotional needs, and that he "desperately need[ed] a learning environment that is designed for twice exceptional children and one that also can individualize demands around the needs, abilities, and vulnerabilities of each

11

child." (DE 193-94; PE 256; Tr. at 979:11-982:12.)[5] Nonetheless, by the end of the school year, K.S.'s progress report indicated that he had achieved all of the goals in his IEP. (Ds' 56.1 ¶ 38; DE 233-35.)

### 5.    2022-2023 IEP and School Year

The CSE met on April 19, 2022 to conduct an annual review and create K.S.'s IEP for the 2022-2023 school year, K.S.'s ninth-grade year. (Ps' 56.1 ¶ 47; Ds' 56.1 ¶¶ 39-40; DE 40-41.) At this meeting, K.S.'s parents informed the District that he had recently been diagnosed with stress-induced ulcers. (Ps' 56.1 ¶ 49; Ds' 56.1 ¶ 41; DE 41.) They also informed the District that, although K.S.'s progress report had noted progress in each IEP goal area, they did not observe any significant growth, and K.S. continued to struggle with developing social skills. (DE 41.)

On the other hand, K.S.'s general education teacher "reported no observed stress with [K.S.] in class" and that K.S. "complet[ed] required work, work[ed] well with peers, and advocate[d] for himself when needed," and the school psychologist reported that K.S. had "demonstrated overall growth in his social skills since sixth grade." (*Id.*; Ds' 56.1 ¶¶ 42, 44.) According to the IEP comments, K.S.'s special education teacher also reported that K.S. "use[d] class time well and participate[d] actively in class," as well as highlighting that K.S. had participated in extracurriculars and made a friend. (DE 41.) And while the special education teacher had heard from other staff that K.S. experienced emotional dysregulation in general education classrooms and at lunch due to the triggers present in those environments, he testified

---

[5] By "twice-exceptional," the parties mean a student with intellectual gifts but also a disability. (Ds' 56.1 ¶ 53.)

12

that he did not observe K.S. experiencing frequent emotional dysregulation in the special education classroom.  (Ps' 56.1 ¶ 50; Tr. 357:7-358:19.)

At the end of the April 2022 meeting, the CSE recommended an in-district placement at John Jay High School ("JJHS").  (Ps' 56.1 ¶ 51; Ds' 56.1 ¶ 45; DE 40-42.)  As with the prior year, this program would involve keeping K.S. in general education classes but providing him with individual counseling once a week.  (Ps' 56.1 ¶ 51; Ds' 56.1 ¶ 45; DE 40-42; *cf.* DE 2.)  And while the IEP no longer provided for group counseling, as the school psychologist reported that K.S. "no longer require[d] group counseling to learn DBT strategies and skills," the IEP increased the frequency of the special "15:1+1" class from four times weekly to once daily.  (Ps' 56.1 ¶ 51; Ds' 56.1 ¶ 45; DE 40-42; *cf.* DE 2.)  In addition to two study skills goals, the IEP included the following social/emotional/behavioral goals:  (1) "When presented with a real or hypothetical situation, the student will identify at least two explanations or interpretations of the other person's behavior;" and (2) "The student will identify two values and one short-term and one long-term goal associated with these values."  (Ps' 56.1 ¶ 53; Ds' 56.1 ¶ 47; DE 47.)  The IEP also provided that K.S. would continue to receive the accommodations of special seating arrangements, reasonable movement breaks, use of a graphic organizer, modified homework assignments, and breaking large assignments into smaller components with interim due dates.  (DE 48; Ds' 56.1 ¶ 48.)

On May 6, 2022, K.S.'s parents emailed the District's Director of Special Services to inquire about the possibility of a neuropsychological evaluation, asking how they could request an evaluation and whether the parents should seek one independently.  (Ps' 56.1 ¶¶ 48, 54; Ds' 56.1 ¶ 49; PE 195.)  Although the Director of Special Services responded to the parents' email by suggesting the possibility of moving up K.S.'s upcoming psychoeducational reevaluation,

which was scheduled to be conducted the following school year, (Ds' 56.1 ¶ 50; PE 195), the CSE ultimately concluded that it "did not need additional information at that time," (Tr. 332:10-333:16, 1082:12-17; Ps' 56.1 ¶ 57; DE 40), and it does not appear that the Parents obtained the evaluation privately.

A Subcommittee of the CSE held another meeting on May 12, 2022, where K.S.'s parents reiterated that although K.S. was not struggling academically, he was still experiencing significant social-emotional difficulties to the point where he was suffering from physical manifestations of stress. (Ps' 56.1 ¶¶ 58-59; DE 40.)  They expressed that much of this stress resulted from K.S.'s placement in general education classes with students who were "not on his wavelength," and that they were considering a private placement at the FlexSchool, a private school designed for gifted and twice-exceptional students. (Ps' 56.1 ¶¶ 58-59; Ds' 56.1 ¶ 52; DE 40; PE 109-10.)  Although the Director of Special Services, who served as Chairperson of the CSE, expressed her view that the recommendations in the April 2022 IEP were appropriate, she also agreed to reach out to an educational consultant specializing in twice exceptionality who could observe K.S. and meet with staff and parents. (Ds' 56.1 ¶ 53; DE 40-41.)  The parents agreed that such an expert could be valuable, but they both expressed doubt that this measure would remedy the stress K.S. experienced as a result of being in an environment with students and teachers "who he does not get" and who "demonstrate behavior he does not understand." (DE 40-41.)  The Chairperson emphasized that K.S. should be educated in the least restrictive environment and that having access to general education peers would be important to support his transition from high school to college, but the parents responded that, according to K.S.'s private providers, "many students need a different setting and venue to thrive." (DE 41.)  Ultimately, the CSE continued to recommend in-district placement, but amended K.S.'s IEP to add both the

twice exceptionality consultant as well as provision for parent counseling and training.  (Ps' 56.1 ¶¶ 61-63; Ds' 56.1 ¶ 53; DE 40-41.)

The CSE reconvened on August 9, 2022 to discuss the findings of the educational consultant, who had observed K.S. in one session of his earth science class.  (Ps' 56.1 ¶ 64; Ds' 56.1 ¶ 54; DE 53; Tr. at 285:16-24.)  The consultant reported that while K.S. was "squirmy in his seat at times," he did not appear to exhibit stress in the classroom and that the lesson she observed was appropriate.  (Ds' 56.1 ¶ 54; DE 53.)  She explained that she would meet with the District and the parents throughout the year to help them better understand the student and address any issues that may arise.  (DE 54.)  The CSE also discussed adding an accommodation for K.S. to be allowed "wait time to process and formulate a response" to address the anxiety he experienced when he was called on by a teacher and did not quickly have an answer.  (DE 53.)  The parents again stressed that K.S.'s "core issues" did not arise from lack of support, but rather the general education classroom environment where K.S. "feels different," and that "in this situation the least restrictive is not what is best for the student."  (DE 54.)  They confirmed that K.S. would be placed at the FlexSchool for the 2022-2023 school year, (id.; Ps' 56.1 ¶¶ 65, 67; Ds' 56.1 ¶¶ 55-56), and they sent a withdrawal form the following day, (Ps' 56.1 ¶ 66; DE 237).

All students at the FlexSchool have cognitive test scores indicating that they are highly intelligent, and although not all students at the school have a disability, the majority either have ADHD or are on the autism spectrum.  (Tr. at 771:8-13, 800:6-23.)  The FlexSchool has a total enrollment of approximately twenty-six students, with average class sizes of three to four.  (Ps' 56.1 ¶ 81; Ds' 56.1 ¶ 59; Tr. at 811:23-25, 823:17-824:3; DE 68.)  All staff at the FlexSchool are trained to provide twice-exceptional and autistic students with coping mechanisms and to recognize signs of distress, and the curriculum is designed to address specific social and

15

emotional needs as well as to provide pragmatic language and social development support.  (Ps'
56.1 ¶¶ 82-84, 93-94, 99-100; PE 110; Tr. at 1087:4-12.)  In particular, the school offers a
Program for the Education Enrichment of Relational Skills (PEERS), which provides "evidence-
based social skills treatment to adolescents with autism spectrum disorder, attention
deficit/hyperactivity disorder, anxiety, depression, and socio-emotional problems."  (PE 293; Ps'
56.1 ¶ 97; Tr. at 827:6-16.)  K.S. was enrolled in twice-weekly social skills groups where a social
worker met with a group of ten high schoolers to help them develop social pragmatics skills by
role-playing social situations, discussing how to send appropriate emails or ask friends to hang
out on weekends, and the like.  (Ps' 56.1 ¶ 98; Tr. at 826:21-828:16.)  The social worker is also
available on-demand for individual counseling or to address episodes of stress or dysregulation.
(Ps' 56.1 ¶ 102; Tr. at 843:14-844:14.)

The staff members at the FlexSchool meet weekly to discuss individual students, and the
curriculum is designed to be flexible so that teachers can tailor classes and assignments to
students' needs and interests.  (Ps' 56.1 ¶¶ 87-88; Tr. at 830:25-831:11, 850:12-853:12.)  The
FlexSchool also focuses on minimizing sensory stressors by avoiding loud alarms and installing
sound machines to cancel outside noise in hallways, and K.S. is able to wear headphones to
avoid overstimulation without it making him feel like a "freak," as it did in JJMS.  (Ps' 56.1 ¶¶
89-91; Tr. at 855:6-856:17, 1029:7-21, 1041:24-1042:12.)  Executive functioning supports are
also built into the school's curriculum, and staff were aware of and addressed K.S.'s relatively
slow processing speed and his struggles with feeling overwhelmed by larger projects, such as by
providing visual prompts and graphic organizers and breaking up assignments into more
manageable chunks.  (Ps' 56.1 ¶¶ 103-04; Tr. at 819:20-821:16.)  He was also assigned less
homework, although he continued to take academically rigorous courses.  (Ps' 56.1 ¶ 85; Tr. at

1088:9-17.)  The FlexSchool also provides parent support and education via weekly newsletters, monthly online parent workshops, meetings with teaching staff and detailed written reports on student progress.  (Ps' 56.1 ¶ 105.)

### 6. 2023-2024 IEP and School Year

The CSE reconvened on May 16, 2023 to develop K.S.'s IEP for the 2023-2024 school year.  (Ps' 56.1 ¶ 68; Ds' 56.1 ¶ 60; DE 67.)  At this meeting, the CSE discussed K.S.'s most recent evaluation, which the District had conducted in February 2023.  (Ps' 56.1 ¶ 69; Ds' 56.1 ¶¶ 61-62; DE 67, 71.)  Once again, K.S.'s cognitive abilities were in the "extremely high range," and his processing speed was in the average range.  (Ps' 56.1 ¶ 69; Ds' 56.1 ¶ 61; DE 71, 107, 110.)  According to the behavioral assessment portion of the evaluation, K.S. reported that "he likes school as much as others his age," but that "he has little control over events in his life and has difficulty establishing and maintaining close relationships, including those with his parents." (DE 71, 113.)  He also reported "generally feeling sad and misunderstood and having substantial worrying and nervousness," as well as "an overall negative self-image."  (DE 71, 113.)  He also scored in the "Clinically Significant" range for "Internalizing Problems," including in the subcategories of "Locus of Control," "Social Stress," and "Depression," as well as for "Relations with Parents," "Interpersonal Relations," and "Self-Esteem."  (DE 114-15.)  In the "School Problems" area, however, K.S. was now in the age-appropriate range, rather than the "Clinically Significant" range.  (DE  114; *cf*. DE 91.)  A representative from the FlexSchool reported that K.S. was a "straight 'A' student" and had made friends with whom he shared interests, but that he nonetheless struggled with self-doubt and with maintaining and sustaining relationships.  (DE 68; Ps' 56.1 ¶ 71; Ds' 56.1 ¶ 63.)

17

The CSE again recommended that K.S. be placed at JJHS in general education classes and participate in the TSP.  (Ps' 56.1 ¶¶ 72-73; Ds' 56.1 ¶¶ 65-66; DE 67-68.)  The IEP provided for K.S. to take the special class in support and skills, this time twice daily and with a ratio of twelve (rather than fifteen) students to one teacher.  (Ps' 56.1 ¶¶ 72-73; Ds' 56.1 ¶¶ 65-66; DE 67-69.)  It also offered K.S. individual counseling for thirty minutes per day, parent counseling and training once per month, and indirect consultant teacher services[6] for three hours per day, (Ps' 56.1 ¶ 72; Ds' 56.1 ¶ 65; DE 67), as well as observation by and consultation with an expert on twice exceptionality once per month, (Ds' 56.1 ¶ 68; DE 69, 79).  In order to support school personnel in addressing K.S.'s needs, the IEP also provided that the school psychologist would meet with K.S.'s teachers monthly to monitor his progress and provide psychoeducation; that the school counselor, TSP team and K.S.'s teachers would hold a "team meeting" at the beginning of each year; that the twice exceptionality expert would conduct an annual information session on disability education; and that the TSP team would meet monthly with a Cognitive Behavioral Consultant to discuss K.S.'s progress and areas of concern.  (DE 78-79; Tr. at 519:7-11.)  The IEP contained two study skills goals and the following social/emotional/behavioral goals:  (1) "When presented with a real or hypothetical situation, the student will identify at least two explanations or interpretations of the other person's behavior," and (2) "The student will identify the appropriate Interpersonal Effectiveness Skill (GIVE, DEARMAN, FAST, THINK) he can use to interact with peers based on his goal for the social interaction."  (DE 76; Ps' 56.1 ¶ 75.)[7]

---

[6] The provision for indirect services refers to the time spent by the program teacher working "behind the scenes" on K.S.'s behalf, including reviewing data collection from teacher assistants and meeting individually with K.S.'s teachers to discuss modification of homework assignments or planning for group work.  (Tr. at 516:12-517:8.)

[7] The DBT program used various acronyms to aid in teaching behavioral skills.  (*See* Tr. at 1065:9-14.)

It also included a career/vocational/transition goal requiring K.S. to "articulate 1 to 2 areas of interest in career exploration and begin researching those areas." (DE 76; Ds' 56.1 ¶ 70.) And in addition to repeating the accommodations contained in the prior IEP – special seating arrangements, reasonable movement breaks, use of a graphic organizer, modified homework assignments, wait time to process and formulate a response, and breaking large assignments into smaller components with interim due dates – the updated IEP also provided that K.S. would have access to the support of a TSP Teaching Assistant to support him "in his courses, within the TSP room or simply with monitoring of attendance and mood." (DE 69, 77-78; Ds' 56.1 ¶ 67.)

K.S.'s parents disagreed with the recommendations in the IEP, expressing doubt that K.S. was ready to return to a general education environment with larger class sizes and students who had previously bullied him, particularly given that K.S. still "discussed being in a dark place at times" and struggled with self-harm. (Ps' 56.1 ¶ 74; Ds' 56.1 ¶ 69; DE 68-69.) They also did not believe that the DBT program that the District offered was appropriate for K.S., as DBT had been ineffective for K.S. in middle school. (Ps' 56.1 ¶ 74; DE 68.) They therefore informed the District that they would be reenrolling K.S. in the FlexSchool for the 2023-2024 school year, citing their belief that K.S. has "made considerable progress at the FlexSchool" and their concerns with the program proposed by the CSE. (Ps' 56.1 ¶¶ 76-77; Ds' 56.1 ¶ 71; DE 239.)

## B.    Procedural History

### 1.    Due Process Complaint and IHO Decision

On September 21, 2023, Plaintiffs filed a Due Process Complaint ("DPC") and request for an impartial hearing, alleging that the District failed to offer K.S. a free appropriate public education ("FAPE") for the 2021-2022, 2022-2023 and 2023-2024 school years and that the FlexSchool was an appropriate placement. (Ps' 56.1 ¶¶ 107-08; IE 23.) They sought

19

reimbursement of K.S.'s tuition and related expenses at the FlexSchool for the 2022-2023 and 2023-2024 school years.  (Ps' 56.1 ¶ 108; Ds' 56.1 ¶ 73; IE 23.)  An impartial hearing spanning six hearing dates was held before Impartial Hearing Officer ("IHO") Lisa Rusk.  (Ps' 56.1 ¶ 109; Ds' 56.1 ¶ 76.)  During the hearing, both parties presented witness testimony and introduced exhibits into evidence, and after the conclusion of the final hearing date on March 4, 2024, each side submitted a post-hearing brief.  (Ps' 56.1 ¶¶ 110-12; Ds' 56.1 ¶¶ 77-79.)

On May 31, 2024, the IHO issued a thirty-nine page,[8] one-and-a-half-spaced decision (the "IHO Decision"), finding that the District had denied K.S. a FAPE for all three school years at issue, that the FlexSchool was an appropriate placement for K.S., and that equitable considerations did not require a reduction in the amount of tuition reimbursement awarded to Plaintiffs.  (Ps' 56.1 ¶¶ 113-14, 121-22; Ds' 56.1 ¶¶ 80-83; I 5-43.)  In particular, the IHO found that (1) the District's DBT-focused program was insufficient to address K.S.'s needs resulting from his primary diagnosis of autism, as K.S. had learned all of the DBT skills but was unable to independently utilize them when he became dysregulated and DBT failed to address the underlying cause of his dysregulation, (Ps' 56.1 ¶ 117; I 26-29); (2) the IEPs developed for each year "failed to contain sufficient evaluative information regarding [K.S.]'s social pragmatic language needs and sensory needs," (Ps' 56.1 ¶ 118; I 30, 35, 39); (3) the goals in each of the IEPs were insufficient to address K.S.'s needs, (Ps' 56.1 ¶ 119; I 30, 35, 39);[9] and (4) each of the IEPs failed to provide appropriate services to address K.S.'s social skills deficits, (Ps' 56.1 ¶

---

[8] The IHO Decision is fifty-two pages but the first four and last nine are not substantive.

[9] Specifically, the IHO found that the 2021-2022 IEP failed to include goals to address K.S.'s "recognized needs in social skills, social language and his feelings about himself," (I 30); the 2022-2023 IEP failed to include goals to address K.S.'s "identified needs in social skills and social language," (I 35); and the 2023-2024 IEP failed to include goals to address K.S.'s "identified needs in social skills, social language and his sense of self-worth," (I 39).

120; I 30, 35, 39).  Accordingly, the IHO ordered the District to reimburse Plaintiffs for the costs

of K.S.'s tuition at the FlexSchool for the 2022-2023 and 2023-2024 school years.  (Ps' 56.1 ¶

123; Ds' 56.1 ¶ 84.)

### 2.     The District's Appeal and the State Review Officer Decision

The District appealed the IHO's decision to the New York State Education Department's

Office of State Review.  (Ps' 56.1 ¶ 124; Ds' 56.1 ¶ 85.)  The District contended that (1) the IHO

had impermissibly ruled on issues that were not raised in the DPC; and (2) the record did not

support the IHO' findings that (a) the IEPs for the 2021-2022, 2022-2023 and 2023-2024 school

years failed to provide K.S. with a FAPE; (b) the FlexSchool was an appropriate placement for

K.S.; and (c) the balancing of the equities favored Plaintiffs.  (Ps' 56.1 ¶¶ 125-26; Ds' 56.1 ¶¶

86-87.)

The SRO issued a thirty-three page, single-spaced decision on August 9, 2024, sustaining

the District's appeal (the "SRO Decision").  (Ps' 56.1 ¶ 128; Ds' 56.1 ¶ 89; SD 1-33.)  The SRO

agreed with the District that the IHO had improperly addressed matters that were not raised in

the DPC – namely, the sufficiency of the evaluative data before the CSE.  (Ps' 56.1 ¶ 133; Ds'

56.1 ¶ 93; SD 11-12.)[10]  The SRO then found that the IEPs developed for each relevant school

year were appropriate and offered K.S. a FAPE.  (Ps' 56.1 ¶ 132; Ds' 56.1 ¶ 92; SD 33.)  The

SRO thus reversed the portions of the IHO's decision finding that the District had not offered

K.S. a FAPE and directing tuition reimbursement.  (Ps' 56.1 ¶ 135; Ds' 56.1 ¶ 95; SD 33.)[11]

---

[10] The SRO also found that the DPC had not raised the issue of whether the IEP goals
were adequate, but that the District had "opened the door" to that issue during the impartial
hearing such that it was proper for the IHO to address it.  (Ps' 56.1 ¶ 134; Ds' 56.1 ¶ 94; SD 12.)

[11] Given his finding that the District had offered K.S. a FAPE, the SRO did not address
whether the FlexSchool was an appropriate placement or whether equitable considerations tipped
in the Plaintiffs' favor.  (Ps' 56.1 ¶¶ 136-37; Ds' 56.1 ¶¶ 96-97; SD 33.)

### 3.    The Instant Action

Plaintiffs filed their Complaint in this Court on December 5, 2024.  (ECF No 1.)  On December 17, 2024, the District filed a pre-motion letter seeking a conference to discuss their anticipated motion to dismiss on the grounds of improper service and that one of the Parents, then unrepresented, had not signed the Complaint.  (ECF No. 7.)  After Plaintiffs filed a reply letter outlining their attempt at service and curing the signature issue, however, (ECF No. 9), the District instead filed an Answer, (ECF No. 11).

The Court held a conference on January 23, 2025, during which it granted Plaintiffs leave to amend the Complaint.  (*See* Minute Entry dated Jan. 23, 2025.)  Plaintiffs filed their Amended Complaint on February 13, 2025, (ECF No. 13), and then obtained the Court's permission to file a Second Amended Complaint, (ECF No. 16 ("SAC")), to correct a clerical error in the Amended Complaint.

The SAC, which was filed on February 18, 2025, seeks a judgment in Plaintiffs' favor (1) reversing the SRO's August 9, 2024 finding and decision; (2) reinstating the May 31, 2024 IHO Decision; and (3) ordering Defendant to reimburse Plaintiffs for all expenses for FlexSchool tuition for 2022-2023 and 2023-2024, as well as attorney's fees, prejudgment interest, and related costs for both the instant action and the underlying IHO and SRO proceedings.  (*Id.*)

## II.    LEGAL STANDARDS

### A.    Summary Judgment Standard for IDEA

Motions for summary judgment customarily resolve IDEA actions in federal court.  *See Antonaccio ex rel. Alex v. Bd. of Educ.*, 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003).  Under the IDEA, unlike in the usual case, the existence of a disputed issue of fact will not defeat the motion.  *See id.*  Rather, summary judgment "is a pragmatic procedural mechanism for reviewing

administrative decisions." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009).[12]  In reviewing an action pursuant to 20 U.S.C. § 1415(i), the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C); *see P.C. v. Rye City Sch. Dist.*, 232 F. Supp. 3d 394, 406 (S.D.N.Y. 2017).

The court's review "requires a more critical appraisal of the agency determination than clear-error review but falls well short of complete *de novo* review."  *L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 108 (2d Cir. 2016).  The district court must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence, but its review of state administrative decisions is limited.  *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982); *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012); *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998).  "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."  *Walczak*, 142 F.3d at 129; *see M.H.*, 685 F.3d at 240.

In many instances, "the district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court," but the determination

---

[12] Unless otherwise indicated, case quotations omit internal citations, quotation marks, footnotes and alterations.

"must also be colored by an acute awareness of institutional competence and role." *M.H.*, 685 F.3d at 244. Deference to administrative decisions is particularly warranted where the district court's review "is based entirely on the same evidence as that before the SRO," *id.*, and where the IHO and SRO decisions are in agreement, *C.W. v. City Sch. Dist.*, 171 F. Supp. 3d 126, 131-32 (S.D.N.Y. 2016). Where the IHO and SRO decisions conflict, the IHO's "may be afforded diminished weight," as the Court "defer[s] to the final decision of the state authorities" – that is, the SRO's decision. *See A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009). Reviewing courts should also be mindful that they are not to "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Accordingly, "a court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned," *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012), particularly with respect to "determinations regarding the substantive adequacy of an IEP," *M.H.*, 685 F.3d at 244. In short, deference to "the application of expertise and the exercise of judgment by school authorities" is appropriate where they "offer a cogent and responsive explanation for their decisions." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 404 (2017).

"New York's regulations implementing the goals of the IDEA 'appear to track the IDEA closely.'" *P.C.*, 232 F. Supp. 3d at 408 (quoting *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363 (2d Cir. 2006)); *see* N.Y. Educ. Law §§ 4401 to 4410-b. Parents are entitled to challenge "any matter relating to the identification, evaluation or educational placement of the student or the provision of a free appropriate public education to the student." N.Y. Educ. Law § 4404(1); *see also* 20 U.S.C. § 1415(b)(6)(A) (same). Such challenges must be heard at an impartial due process hearing conducted by the state or local education agency, *see* 20 U.S.C. § 1415(f), and

24

either party may appeal an adverse decision to the appropriate state agency, *see id.* § 1415(g); N.Y. Educ. Law § 4404(2).  Once this administrative process is exhausted, a party may file a civil action in federal or state court challenging the administrative decision.  *See* 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

### B.    Provision of a FAPE and Unilateral Placement in Private Schools

"States receiving federal funds under the IDEA must provide disabled children with a FAPE," *Ferreira v. Aviles-Ramos*, 120 F.4th 323, 329 (2d Cir. 2024), which "consists of special education and related services tailored to meet the unique needs of a particular child," *Cruz v. Banks*, 134 F.4th 687, 691 (2d Cir. 2025), *certified question accepted*, 43 N.Y.3d 983 (2025).  Related services include "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education."  20 U.S.C. § 1401(26)(A).

"The IEP is 'the centerpiece of the [IDEA's] education delivery system for disabled children.'"  *Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 741 (2d Cir. 2018) (quoting *Endrew F.*, 580 U.S. at 391).  The IEP must be developed annually by "a school official qualified in special education, the child's teacher, the parents or guardian, and, where appropriate, the child."  *Archibald v. Banks*, No. 24-CV-5919, 2025 WL 2592263, at *1 (S.D.N.Y. Sept. 8, 2025), *appeal filed*, No. 25-2330 (2d Cir. Sept. 26, 2025); *see Walczak*, 142 F.3d at 122.  "A school district meets its obligations to provide a FAPE by creating an IEP that is developed in compliance with the IDEA's procedural and substantive requirements."  *N.B. v. N.Y.C. Dep't of Educ.*, 711 F. App'x 29, 32 (2d Cir. 2017) (summary order).  In the Second Circuit, review of the adequacy of an IEP proceeds in two steps:  (1) "whether the state has complied with the procedures set forth in the IDEA" and (2) "whether the IEP was substantively adequate, namely,

25

whether it was reasonably calculated to enable the child to receive educational benefits." *Killoran v. Westhampton Beach UFSD*, No. 21-2647, 2023 WL 4503151, at *2 (2d Cir. July 13, 2023) (summary order). "While substantive violations automatically trigger reimbursement, procedural violations only lead to reimbursement if they significantly impede the parents' opportunity to participate in the decision making process or cause a deprivation of educational benefits." *C.W.*, 171 F. Supp. 3d at 132.

The education program must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," *Endrew F.*, 580 U.S. at 403, and "an IEP providing merely more than *de minimis* progress from year to year is insufficient, " *M.B. ex rel. A.B. v. Katonah-Lewisboro Union Free Sch. Dist.*, No. 24-CV-1745, 2025 WL 2773358, at *8 (S.D.N.Y. Sept. 25, 2025). Nonetheless, the statute guarantees only an appropriate education; an IEP need not "provide everything that might be thought desirable by loving parents." *Id.* at *8.

"In addition to providing an education that is likely to produce progress and tailored to the unique needs of the child, the program must be offered in the least restrictive environment," *N.K.M. ex rel. G.M. v. Rye City Sch. Dist.*, No. 23-CV-1109, 2024 WL 4803941, at *12 (S.D.N.Y. Nov. 15, 2024), known as the "LRE." "[A] disabled student's least restrictive environment refers to the least restrictive educational setting consistent with that student's needs, not the least restrictive setting that the school district chooses to make available." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 163 (2d Cir. 2014). "This requirement expresses a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers." *Id.* at 161; *see* 34 C.F.R. § 300.116 (2006) ("Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled."). To determine whether a

26

student's placement is the LRE, courts consider "(1) whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child, and (2) if not, then whether the school has mainstreamed the child to the maximum extent appropriate." *Killoran*, 2023 WL 4503151, at *3.

"If a parent believes the state has failed to provide their child with a FAPE, they may choose to enroll the child in a private school and seek reimbursement for the cost of the private school education from the local education agency." *Cruz*, 134 F.4th at 691. "Reimbursement is granted only when (1) the proposed IEP failed to provide the student with an appropriate public education; (2) the parent's private placement was appropriate to the child's needs; and (3) equitable considerations support the parent's claim." *Jusino v. N.Y.C. Dep't of Educ.*, 700 F. App'x 25, 27 (2d Cir. 2017) (summary order); *see Cruz*, 134 F.4th at 691 ("To determine whether reimbursement is appropriate, we apply the three-part *Burlington/Carter* test . . . ."). Under New York law, the school district "bears the burden of establishing the validity of the IEP, while the parents bear the burden of establishing the appropriateness of the private placement." *A.N. v. Bd. of Educ.*, 801 F. App'x 35, 36 (2d Cir. 2020) (summary order).

## III.   DISCUSSION

### A.   Sufficiency of Evaluative Information

As a threshold matter, the SRO concluded that the IHO erred in addressing the adequacy of evaluative information relied on by the CSE in developing K.S.'s IEPs, holding that this issue was not raised by Plaintiffs in their DPC or by Defendants during the administrative hearing. (SD 11-12.) Under the IDEA, "the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the complaint, unless the other party agrees otherwise." 20 U.S.C. § 1415(f)(3)(B)); *see C.F. ex rel. R.F. v. N.Y.C. Dep't of*

*Educ.*, 746 F.3d 68, 78 (2d Cir. 2014).  "Accordingly, the party requesting the hearing must lay out specifically in the DPC the issues that will be before the hearing officer, and courts have authority to review only those issues."  *J.C.S. ex rel. J.S. v. Blind Brook-Rye Union Free Sch. Dist.*, No. 12-CV-2896, 2013 WL 3975942, at *8 (S.D.N.Y. Aug. 5, 2013); *see M.R. v. S. Orangetown Cent. Sch. Dist.*, No. 10-CV-1800, 2011 WL 6307563, at *13 (S.D.N.Y. Dec. 16, 2011) ("[T]here is a statutory bar to the IHO considering issues not raised in the demand for a due process hearing absent the district's or IHO's consent to a timely amendment.").

Plaintiffs argue that the IHO properly considered the issue of the sufficiency of evaluative information, both because the issue had in fact been raised in the DPC and because Defendants opened the door to it during the impartial hearing.  (ECF No. 43 ("Ps' Mem.") at 6-8.)  First, Plaintiffs point to their allegation in the DPC that "[a]lthough petitioners had previously requested a neuropsychological evaluation to better determine K.S.'s needs and appropriate program, the district decided no further evaluations were necessary."  (*Id.* at 6 (citing IE 20).)  They contend that this statement – combined with the various allegations in the FPC regarding the District's failure to address K.S.'s struggles with social skills, pragmatic speech, and sensory processing – sufficed to put the District on notice of their claim that the CSE had inadequately evaluated K.S. in the areas of speech-language, occupational therapy, pragmatic language and sensory processing.  (*Id.* at 6-7.)  While the SRO acknowledged this statement, he concluded that it was insufficient, as "the parents did not allege that . . . the district did not have sufficient evaluative information to develop the IEPs for the student for any of the school years at issue," nor did they "allege that the district failed to assess the student's social pragmatic needs through a speech-language evaluation or evaluate the student's sensory needs with an occupational therapy evaluation," as the IHO had ultimately held.  (SD 11-12.)  But given that

28

"determinations about whether arguments are preserved for SRO or district court review are well within the institutional competence of the courts," the Court need not defer to the SRO's determination as to this issue. *J.W. v. N.Y.C. Dep't of Educ.*, 95 F. Supp. 3d 592, 602 (S.D.N.Y. 2015).

The Second Circuit has held that the waiver rule "is not to be mechanically applied," as "the IDEA itself contemplates some flexibility." *C.F. ex rel. R.F*, 746 F.3d at 78.  Although courts may not address an issue that was "completely absent" from the DPC, *see B.P. v. N.Y.C. Dep't of Educ.*, 634 F. App'x 845, 850 (2d Cir. 2015) (summary order), the IDEA "does not require that alleged deficiencies be detailed in any formulaic manner," so long as the DPC provides the school district with "fair notice" of the claims at issue, *C.F. ex rel. R.F*, 746 F.3d at 78.

I doubt that the DPC's single passing reference to the District's conclusion that "no further evaluations were necessary" before developing K.S.'s 2022-2023 IEP, despite the parents' inquiry about further neuropsychological testing, (IE 20),was sufficient to put the District on notice that the Parents were contesting the sufficiency of the evaluative information available for that school year, let alone the other years – especially because it appeared in a detailed, nine-page single-spaced DPC that lists four specific alleged failings on the District's part (but not the lack of evaluative information).  And there is nothing in the DPC about any other evaluations that the Parents believed should have been undertaken.  The Parents point to the DPC's reference to the Parents' concerns with the students' "sensory issues, social skills, and overall socio-emotional needs;" the allegation that "[t]he District deprived Petitioners of meaningful participation in the IEP process by ignoring Petitioners' concerns regarding developing an appropriate program, placement, and/or services" for the student; and the

accusation that the District of "failed to offer and/or provide an appropriate program, placement, services, and accommodations" for the student, (IE 17, 23), but these generalized attacks on the adequacy of the IEP do not suffice to raise the issue that the CSE did not have adequate evaluative data.  While the DPC need not "specifically identify" the issue in so many words, it must say enough to "fairly identify" it.  *P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ., (Region 4)*, 526 F. App'x 135, 140 n.6 (2d Cir. 2013) (summary order) (although the issue of insufficient 1:1 services was not "specifically enumerated" in DPC, plaintiffs "fairly identified" the issue by alleging that student received insufficient therapeutic services and identifying 1:1 services "as a proposed solution to the denial of a FAPE"); *see B.M. v. Pleasantville Union Free Sch. Dist.*, No. 20-CV-2192, 2021 WL 4392281, at *15 (S.D.N.Y. Sept. 24, 2021) ("A due process complaint must list the alleged deficiencies with enough specificity so that the defendant is able to understand the problems and attempt to remedy them.").  In other words, argument that the Student's needs were not met is not argument that the Student was not sufficiently evaluated.

The Second Circuit has recognized an exception to the waiver rule where a defendant "opened the door" to an otherwise waived issue during the impartial hearing.  *Thomason v. Porter*, No. 21-CV-6713, 2023 WL 1966207, at *15 (S.D.N.Y. Feb. 13, 2023) (citing *M.H.*, 685 F.3d at 250-51); *see Bd. of Educ. v. A.D.*, No. 16-CV-02025, 2017 WL 4466613, at *1 (S.D.N.Y. Oct. 5, 2017) ("If the district . . . raises a claim or elicits testimony regarding a claim not included in the initial complaint, an IHO may find that the district 'opened the door' to that claim."), *aff'd*, 739 F. App'x 79 (2d Cir. 2018) (summary order).  "Courts have found that a party has 'opened the door' to an issue that wasn't raised in the original due process complaint if it raises the issue during the hearing and the issue comprises a large part of the testimony presented at the hearing."  *Bd. of Educ.*, 2017 WL 4466613, at *4.  Plaintiffs also argue that the

30

District opened the door by raising the adequacy of evaluative information it in its Due Process Response, opening statement, direct examination of its witnesses, and post-hearing brief. (Ps' Mem. at 7.) But while the District generally referenced evaluative information throughout the hearing, the testimony that Plaintiffs contend "opened the door" to the sufficiency issue involved particular evaluations that K.S. had undergone, (*see* Tr. at 34:12-25; 37:14-25), or the inclusion of such evaluations on the IEPs, (Tr. at 20:5-10). Such references are insufficient to raise the issue of whether *additional* evaluations should have been conducted, let alone to show that this issue "comprise[d] a large part of the testimony presented at the hearing." *Bd. of Educ.*, 2017 WL 4466613, at *4. In short, the District's statement in its Answer to the DPC that the material it considered included evaluations supplied by the Parents, and its references during the hearing to evaluations of the Student, do not open the door to the issue of whether other evaluations should have been obtained.

In any event, assuming the issue was preserved for review, it does not merit reversal. Because the SRO found that the issue of evaluative data was not raised in the DPC, he did not address the merits of the claim. (SD 12.) Accordingly, the IHO's opinion as to this issue is owed deference where supported by the record. *See K.R. v. N.Y.C. Dep't of Educ.*, 107 F. Supp. 3d 295, 311 (S.D.N.Y. 2015) (deferring to IHO's conclusion where SRO did not address issue); *F.O. v. N.Y.C. Dep't of Educ.*, 976 F. Supp. 2d 499, 521 (S.D.N.Y. 2013) (deference owed to IHO's opinion where SRO did not address issue and IHO's opinion was overwhelmingly supported by the evidence); *D.C. ex rel. E.B. v. N.Y.C. Dep't of Educ.*, 950 F. Supp. 2d 494, 513 (S.D.N.Y. 2013) (IHO's decision entitled to deference where IHO's reasoning was persuasive and SRO did not reach issue).

But even assuming, without deciding, that the IHO correctly found that the District should have conducted additional evaluations before developing K.S.'s IEP, the failure to consider sufficient evaluative data constitutes a procedural, rather than substantive, violation of the IDEA.  *See C.R. v. N.Y.C. Dep't of Educ.*, 211 F. Supp. 3d 583, 608 (S.D.N.Y. 2016); *P.L. v. N.Y. Dep't of Educ.*, 56 F. Supp. 3d 147, 159-60 (E.D.N.Y. 2014).  Thus, the failure to conduct additional evaluations would not violate the IDEA unless it "significantly impede[d] the parents' opportunity to participate in the decision making process or cause[d] a deprivation of educational benefits."  *C.W.*, 171 F. Supp. 3d at 132; *see L.B. v. Katonah-Lewisboro Union Free Sch. Dist.*, No. 14-CV-6805, 2016 WL 4926203, at *8-9 (S.D.N.Y. Sept. 14, 2016).

It is unclear whether the IHO concluded that the failure to conduct further testing resulted in the denial of a FAPE; for each school year at issue, the IHO stated that the relevant IEP "failed to contain sufficient evaluative information regarding the Student's social pragmatic language needs and sensory needs," but then immediately stated that the IEP failed to contain goals to address K.S.'s recognized or identified needs, such as those in "social skills, social language and his feelings about himself."  (I 30, 35, 39.)  Indeed, in concluding that K.S.'s social pragmatic and sensory needs were insufficiently evaluated, the IHO relied on information that was already available to the parents and the District at the time the IEPs were developed.  (*See, e.g.*, I 10 (school psychologist testified that K.S. "had pragmatic language deficits throughout his three years at JJMS, including difficulty reading social cues, misinterpreting sarcasm, misinterpreting intentions and difficulty generalizing acquaintances in class and out of class"); I 27 n.20 (Four Winds suggested noise cancelling headphones or a similar device to help with K.S.'s sensory issues); I 28 (K.S.'s seventh-grade special education teacher believed that K.S.'s primary issue was "the language piece," as is common for students with autism, and "the emotional

32

dysregulation piece stemmed from the language piece and the executive functioning piece").)
Given that the Student's deficits in these areas were known, it is unclear what data Plaintiffs believe was missing at the time of the 2021 CSE meeting such that the resulting IEP was inadequate.   Nor does the record contain any reference to what information a neuropsychological evaluation might have contained that would have affected the conclusions reached by the CSE at the time.   In other words, the IHO's holding that the District denied K.S. a FAPE appears to be drawn from the District's failure to adequately address acknowledged problems, rather than its failure to identify those problems through further evaluation.   *Cf. MN ex rel. EN v. Katonah Lewisboro Sch. Dist.*, No. 19-CV-6793, 2020 WL 7496435, at *14 (S.D.N.Y. Dec. 21, 2020) (District was not required to update IEP based on new report where CSE had already considered deficiencies identified in report when developing IEP).

Moreover, the IHO did not hold that the parents were denied meaningful participation in the IEP process.   Nor was there any basis for it to so hold; the parents raised the neuropsychological evaluation at the CSE meeting, and the topic was discussed and noted in the IEP comments.   (DE 40; Tr. at 332:10-333:16.)   Although the District (which had offered an acceleration of the upcoming psychoeducational evaluation) ultimately concluded that further testing was not needed at the time, it cannot be said that the parents were denied meaningful participation.   *See K.S. ex rel. L.S. v. Harrison Cent. Sch. Dist.*, No. 24-CV-6318, 2025 WL 3442916, at *25 (S.D.N.Y. Dec. 1, 2025) (collecting cases).

Thus, given the lack of evidence in the record that the District's failure to conduct further evaluation of K.S. resulted in the denial of a FAPE, the Court declines to find that the District violated the IDEA on this basis.   *See C.R.*, 211 F. Supp. 3d at 608.

**B.    2021-2022 IEP**

**1.    2021-2022 Annual Goals**

For each of the school years at issue, the IHO found that the annual goals contained in K.S.'s IEP were insufficient, while the SRO found that they were appropriate.  (*Compare* I 30, 35, 39, *with* SD 15-16, 23-24, 30-31.)

"An IEP must include a statement of measurable annual goals," *Phillips v. Banks*, No. 23-362, 2024 WL 1208954, at *2 (2d Cir. Mar. 21, 2024) (summary order), along with "evaluative criteria, evaluation procedures and schedules to be used to measure progress toward meeting the annual goal," *R.B. v. N.Y.C. Dep't of Educ.*, 15 F. Supp. 3d 421, 433 (S.D.N.Y. 2014), *aff'd*, 603 F. App'x 36 (2d Cir. 2015) (summary order).  The "goals [must] be designed both to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum and to meet each of the child's other educational needs that result from the child's disability." *C.W.*, 171 F. Supp. 3d at 134.  "[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Phillips*, 2024 WL 1208954, at *2.

Plaintiffs argue that the IHO correctly found that the social-emotional goals set for the 2021-2022 school year were insufficient to address K.S.'s feelings of "inadequacy and withdrawal," as well as his struggles with "initiating conversations, working in a group, self-advocacy, the use of social language, and understanding social cues."  (Ps' Mem. at 9 (citing I 28).)  As the SRO pointed out, however, the IEP included three social/emotional/behavioral goals:  one designed to address K.S.'s struggle to independently apply the skills to manage emotional dysregulation he had learned, (*see* DE 34 ("When the student discusses an instance of emotion dysregulation in counseling sessions, he will report having used one distress tolerance

and/or emotion regulation skill to manage this.")), and two to address his struggles with socialization, particularly his difficulty with interpersonal relationships, (*id.* ("The student will report having used one socialization skill (i.e., initiating a conversation with peers, joining a club, making plans with friends) to foster his success regarding interpersonal relationships.")), and his sense of belonging, (*id.* ("When asked in individual counseling sessions, the student will report having attended at least one club that week or the prior week in order to increase his sense of social belonging.")).  The IHO's conclusion that "[t]he 2021-22 IEP does not contain any goals to assist [K.S.] in the development of interpersonal relationships," (I 28), is thus belied by the record, and the SRO's findings are entitled to deference, *see Phillips*, 2024 WL 1208954, at *2.

And while the IEP did not explicitly address some of the specific areas highlighted by the IHO – such as "working in a group, self-advocacy, the use of social language or understanding social cues," (I 28), the more general social goals included in the IEP – which were calculated to improve K.S.'s ability to connect and interact with his peers – fairly encompassed these needs, *see C.W.*, 171 F. Supp. 3d at 134 (even where "every deficit area of the student's functioning may not have had a corresponding goal," annual goals need only "adequately address[] the student's main areas of need"); *R.C. ex rel. M.C. v. Byram Hills Sch. Dist.*, 906 F. Supp. 2d 256, 272 (S.D.N.Y. 2012) (goals aimed at improving student's social skills and classroom behavior were sufficient despite not explicitly addressing student's anxiety where "[p]laintiffs offer[ed] no reason why the stated social goals would not also relate to [the student]'s anxiety").  Thus, given that "an IEP does not need to identify annual goals for every deficit in order to provide a FAPE," *J.B. v. N.Y.C. Dep't of Educ.*, 242 F. Supp. 3d 186, 199 (E.D.N.Y. 2017), the Court defers to the SRO's determination that the IEP as a whole appropriately addressed K.S.'s needs.

The IHO also pointed out that the IEP required K.S. to report having used one socialization skill, but "there are no measurable goals to actually teach him those skills." (I 29.) But annual goals are designed to allow the CSE to measure a student's progress in particular areas, not to delineate how the school would assist the student in making such progress. In other words, while (as discussed further below) the IEP was indeed required to specify services to assist in supporting the development of K.S.'s social skills, *see Walczak*, 142 F.3d at 122, the annual goals are meant to state objectives, not the methodology for helping the student achieve those objectives, *see M.E. v. N.Y.C. Dep't of Educ.*, No. 15-CV-5306, 2018 WL 582601, at *11 (S.D.N.Y. Jan. 26, 2018); *M.H. v. N.Y.C. Dep't of Educ.*, 712 F. Supp. 2d 125, 156-57 (S.D.N.Y. 2010), *aff'd*, 685 F.3d 217 (2d Cir. 2012). The Court therefore agrees with the SRO the 2021-2022 annual goals did not deny K.S. a FAPE.

### 2.    Supports Offered in the 2021-2022 IEP

For the 2021-2022 school year, K.S.'s IEP provided that he would receive weekly individual counseling, the special "15:1+1" class four times weekly, and monthly small group counseling. (Ps' 56.1 ¶¶ 32-33; Ds' 56.1 ¶¶ 25-26; DE 2-3.) It provided for adult supervision during lunch to help coach K.S. in developing friendships, and it noted that the District would create a club with K.S. specifically in mind to aid him in developing relationships with his peers. (DE 28.)

The IHO concluded that "[t]he 2021-22 IEP was not reasonably calculated with goals and services to enable the student to make both academic and functional progress," as it failed to include a formal social skills group and K.S. "needed more than the DBT program offered" to address his needs. (I 28-30.) The IHO noted that "[t]he addition of the lunch aide was ineffective;" that K.S. "ha[d] difficulty implementing his DBT skills independently, including for

developing and maintaining social connections and navigating group dynamics;" and that K.S. ultimately continued to experience suicidal ideations and had developed stress-induced ulcers by the end of the school year.  (*Id.*)

The SRO disagreed, finding that the 2021-2022 IEP provided K.S. with a FAPE.  The SRO acknowledged that K.S.'s private psychologist felt that he required a specialized program, but noted that K.S.'s math teacher and the school psychologist both disagreed, testifying that K.S. participated actively in his general education classes and that the added supports described in the IEP allowed K.S. to progress without the need for a specialized program.  (SD 18.)  The SRO also pointed out that, in relying on K.S.'s eventual diagnosis of ulcers, the IHO was improperly relying on evidence that was not available at the time the IEP was developed.  (SD 18-19.)  *See J.S. v. N.Y.C. Dep't of Educ.*, 104 F. Supp. 3d 392, 402 (S.D.N.Y. 2015) (explaining that the appropriateness of an IEP should be evaluated as of the time it was made), *aff'd*, 648 F. App'x. 96 (2d Cir. 2016) (summary order).  And as for the episode of suicidal ideation cited by the IHO, the SRO noted that K.S. had reported suicidal ideation and emotional dysregulation for years and that those symptoms had actually decreased since he began at the district.  (SD 18-19.) The SRO held that the District had addressed K.S.'s feelings of social isolation by creating the after-school club and providing for the lunch aide, and that his progress report reviewing the prior school year showed that he had made demonstrable progress in his social skills under the TSP program.  (SD 19-20.)

The SRO's conclusion is supported by the record and thus entitled to deference. "[B]ecause administrative agencies have special expertise in making judgments concerning student progress, deference to the SRO is particularly important when assessing an IEP's substantive adequacy."  *McCallion v. Mamaroneck Union Free Sch. Dist.*, No. 10-CV-6207,

2013 WL 237846, at *9 (S.D.N.Y. Jan. 22, 2013).  Thus, where the SRO relies on testimony from educators that the student has made progress pursuant to past IEPs, the Court should not overturn the SRO's decision as to the updated IEP's substantive adequacy, particularly where the updated IEP provides for further supports and recommendations calculated to further advance the student's progress.  *See id.*; *see also P.C.*, 232 F. Supp. 3d at 410 (SRO reasonably concluded that IEP was likely to yield progress where it enhanced services offered in prior IEP).

Here, while it is clear that K.S. continued to experience emotional dysregulation and significant anxiety, the SRO correctly noted that K.S. had presented with "significant behavioral dysregulation and decompensation" since beginning at the District, and that the IEP included a host of measures for addressing K.S.'s social-emotional needs, including the individual counseling he had previously been receiving, as well as the added measures of adult supervision at lunch and the creation of a specialized club.  (SD 16-19; *see* DE 27-29.)  And although the IHO stated that K.S. "needed more than the DBT program offered," (I 28), as K.S. "already had two years of instruction in DBT techniques" to address his emotional dysregulation and DBT "never addressed the cause of the dysregulation," (I 29), the record shows that DBT skills were effective in reducing K.S.'s dysregulation when staff supported him in implementing these skills, and the IEP instituted individual counseling and an annual goal to assist K.S. in applying these skills independently, (DE 29, 33; *see* Tr. at 53:2-21, 120:10-21 (explaining that learning to independently apply DBT skills was a focus in K.S.'s individual counseling sessions)).  Moreover, while K.S.'s private psychologist was "pretty convinced" that K.S. required a specialized program, (DE 28), the "mere fact that a separately hired expert has recommended different programming does nothing to change the deference owed to the district and its trained educators." *MN ex rel. EN*, 2020 WL 7496435, at *14.  Accordingly, the Court defers to the

38

SRO's well-reasoned decision that the District provided K.S. with a FAPE for the 2021-2022 school year.

### C.     2022-2023 IEP

#### 1.     2022-2023 Annual Goals

As with the prior school year, the SRO found that the IHO erred in concluding that the 2022-2023 annual goals were insufficient to address K.S.'s social and emotional needs.  (SD 23-24.).  The 2022-2023 IEP included the following social/emotional/behavioral goals:  (1) "When presented with a real or hypothetical situation, the student will identify at least two explanations or interpretations of the other person's behavior;" (2) "The student will identify two values and one short-term and one long-term goal associated with these values."  (Ps' 56.1 ¶ 53; Ds' 56.1 ¶ 47; DE 47.).  These goals were designed to measure K.S.'s progress in areas targeted by individual counseling, including "identify[ing] personal values and engag[ing] in values-related goals," as well as "maintain[ing] and develop[ing] peer relationships" and "understand[ing] and identify[ing] alternate perspectives and reasons for people's actions."  (DE 60.)  In particular, the goal requiring K.S. to identify values was meant to reduce K.S.'s depression and suicidal ideation by helping him recognize that his life had meaning.  (*See* Tr. at 92:23-93:10.)

In finding that these goals were appropriate, the SRO relied on the testimony of the District's director of special services that these goals supported K.S.'s social-emotional needs. (SD 24 (citing Tr. at 261:23-262:4, 296:10-18).).  The SRO also relied on the District staff's report that K.S. had made demonstrable progress in his social skills over the past year – as he had befriended a peer, participated in a club and engaged in social activities during lunch/recess – and noted that while the parents denied that K.S. had made "significant growth," they

nonetheless agreed that he had shown progress in each IEP goal area.  (SD 23-24 (citing DE 55).)

The IHO found that these goals were insufficient because they did not address K.S.'s "continued difficulties with developing and maintaining peer relationships and his reluctance to support and prompting [*sic*] in this area from staff," nor "the social language needed to develop and foster such relationships or navigate group dynamics."  (I 34.)  But as discussed, K.S. had demonstrated some progress – if not what his parents would consider "significant" progress – in his social relationships, and the goal requiring him to interpret others' behavior was calculated to further help him with "maintain[ing] and develop[ing] peer relationships."  (DE 60.)  While this goal did not expressly address K.S.'s struggles with "social language," as discussed above, "an IEP does not need to identify annual goals for every deficit in order to provide a FAPE," *J.B.*, 242 F. Supp. 3d at 199.  The Court defers to the SRO's decision that the 2022-2023 goals adequately addressed K.S.'s need to further develop social skills.

### 2.    Supports Offered in the 2022-2023 IEP

K.S.'s 2022-2023 IEP recommended that he participate in the high school TSP program and receive similar supports as the prior year, with the addition of the twice-exceptionality consultant to ensure that the classroom environment would meet K.S.'s needs.  (DE 53-55.)  As with the prior year's IEP, the IHO took issue with this IEP's failure to provide for a formal social skills group and its continued reliance on DBT therapy.  (I 34-35.)  The IHO reasoned that the program recommended in the updated IEP was "not demonstrably different" from the past year's program, under which K.S. suffered a depressive episode and developed stress-related ulcers.  (I 35.)  While the Court sympathizes with K.S.'s struggles and by no means discounts the gravity

of his symptoms, the SRO conducted a lengthy analysis of the record in finding that the IEP offered was sufficient, and his decision is entitled to deference.

First, while Plaintiffs contend that the SRO "inappropriately substituted its own credibility determinations of the parties' witnesses for those of the IHO," (Ps' Mem. at 17), the SRO's opinion was based not on a finding that Plaintiffs' witnesses were not credible, but rather that the weight of the evidence favored the District's assessment, (SD 27). In other words, the SRO did not contend that K.S.'s private psychologist and psychiatrist were being untruthful when they testified that they believed K.S. had not made progress; rather, the SRO found that this belief, however honestly held, was outweighed by other evidence in the record. Such a determination is entirely within the purview of the SRO's role and entitled to deference. *See J.A. v. N.Y.C. Dep't of Educ.*, No. 10-CV-9056, 2012 WL 1075843, at *10 (S.D.N.Y. Mar. 28, 2012) (deferring to SRO where "[n]o evidence in the record suggest[ed] that the SRO's disagreement [with Plaintiffs' expert] was the result of an impermissible credibility assessment rather than a difference of opinion among educational policymakers concerning the appropriate inferences and conclusions to be drawn from all of the evidence concerning proposed educational programs and their adequacy in addressing [the student's] specific individual educational needs"); *S.F. v. N.Y.C. Dep't of Educ.*, No. 11-CV-870, 2011 WL 5419847, at *15 (S.D.N.Y. Nov. 9, 2011) (to the same effect); *see also Scott v. N.Y.C. Dep't of Educ.*, 6 F. Supp. 3d 424, 444 (S.D.N.Y. 2014) (suggesting that, although SRO may not make impermissible credibility assessment, SRO may reconsider the weight of the evidence).

In disagreeing with the opinions of the private providers, the SRO pointed to record evidence that K.S. had, in fact, progressed under the TSP program. (SD 27-28.) For instance, K.S. had achieved all of the goals in his prior IEP, including those designed to address his

41

socioemotional deficiencies, and he had reported participating in clubs, meeting with other club members outside of school and enjoying his time with these other students. (*Id.* (citing DE 234-35).) The SRO also analyzed the logs kept of K.S.'s counseling sessions, (SD 28), which reflected that over the course of the 2021-2022 school year, K.S. had identified instances of emotional dysregulation and utilization of DBT skills to cope with these instances. (PE 14-16.) The SRO also relied on the counseling logs as further evidence of K.S.'s progress in developing social skills, noting that he reported the use of skills such as talking to peers in groups during class and reaching out to friends to interact outside of class. (SD 28; PE 16-18.) These reports were bolstered by the testimony of the school psychologist, who reported that K.S. grew in his ability and willingness to discuss emotions, spoke with his peers and participated in clubs, and managed conflict both with support and independently. (SD 28; Tr. at 57:5-21, 71:17-24.)[13] Because "administrative agencies have special expertise in making judgments concerning student progress" and a district court must not "substitute[] its own subjective judgment about what are

---

[13] Plaintiffs argue that, "[a]s noted by the IHO, the school psychologist's testimony is undercut by the fact that she called Plaintiffs late in the 2021-2022 school year to report that K.S. was playing video games in class and evidencing growing emotional dysregulation and inappropriate behavior." (P's Mem. at 17 (citing I 32; PE 14).) But while the school psychologist did report calling K.S.'s father on June 1, 2022 to talk about "video game playing in classes and growing emotion dysregulation, inappropriate behavior," the same note indicated that "[t]hings have been going well except [s]cience," and a log from the subsequent week noted that K.S. was able to address his stress "about transitioning" using the skill of "distraction." (PE 14, 16.) The SRO was not required to discount the school psychologist's testimony regarding K.S.'s overall progress throughout the year based on a single report, which appears to have been related to the transition implicit in the end of the school year. Moreover, the IHO's reference to this report as evidence that K.S. continued to exhibit emotional dysregulation does not, as Plaintiffs argue, necessitate the conclusion that the IHO did not consider the school psychologist a credible witness.

appropriate measures for educational progress," *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005), the Court defers to the SRO's determination.[14]

And while the SRO acknowledged the testimony of K.S.'s private providers that a general education environment was inappropriate for K.S., he provided detailed and well-supported reasons for rejecting their perspective. First, as the SRO noted, K.S.'s providers, unlike the District, did not have the obligation to ensure that K.S. was educated in the LRE. (SD 26.) As discussed above, "[t]he IDEA requires that children with disabilities receive education in the regular classroom whenever possible," *A.L. ex rel. C.L. v. N.Y.C. Dep't of Educ.*, No. 16-CV-02827, 2017 WL 11697978, at *11 (S.D.N.Y. July 11, 2017), and educators have the obligation to ensure that disabled children are educated along with their non-disabled peers to the maximum extent appropriate, *see T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 161 (2d Cir. 2014) (citing 20 U.S.C. § 1412(a)(5)(A)). "The school must aim to minimize the restrictiveness of the student's environment while also considering the educational benefits available in that environment, seeking an optimal result across the two requirements." *Id.* at 162;

---

[14] The Court acknowledges that during the 2021-2022 school year, K.S. developed ulcers that his doctors attributed to stress, and that is undoubtedly a serious and distressing matter. But "progress must be viewed in light of the limitations imposed by the child's disability." *H.C. ex rel. M.C. v. Katonah-Lewisboro Union Free Sch. Dist.*, 528 F. App'x 64, 67 (2d Cir. 2013) (summary order). As the SRO pointed out, K.S. had experienced severe mental health symptoms for several years, the most significant of which presented before he began at the District. (SD 18-19.) The fact that K.S. was still exhibiting symptoms, even if severe, does not mean that he had made no progress under the IEP given the indicia to the contrary, including that he had achieved several prior IEP goals and reported interacting with peers outside of school. (SD 19-20.) Indeed, when asked whether K.S. "will likely always struggle, have social challenges," K.S.'s private psychologist responded,"Without a doubt, yes." (Tr. at 721:16-18.) And even if placement at the FlexSchool could have been more effective than the TSP program in reducing K.S.'s symptoms, "the IDEA does not require that the District provide an ideal learning environment, but instead only one where the student can progress." *R.C. ex rel. M.C.*, 906 F. Supp. 2d at 273; *see C.K. v. Baldwin Union Free Sch. Dist.*, No. 22-CV-2265, 2023 WL 6158699, at *6 (E.D.N.Y. Sept. 21, 2023).

*see J.S.*, 104 F. Supp. 3d at 411 (educators required to provide appropriate education "in the least restrictive educational environment that is consonant with the student's needs").  Here, there is evidence in the record that the District continued to recommend general education classes to avoid further isolating K.S. from his peers, as well as because the District felt that placement in a smaller class would not make sense given K.S.'s cognitive abilities.  (SD 26 (citing Tr. at 98:9-17).)  Thus, while K.S.'s parents felt that he needed "a break from the least restrictive environment," (DE 54), and his private providers were at liberty to reinforce that opinion, the SRO found that the District had properly weighed the benefits of access to non-disabled peers – a factor the private providers were not required to consider.  (SD 26-27.)

The SRO further noted that the private providers' opinion that K.S. needed to be surrounded by other twice-exceptional students focused on K.S.'s giftedness in tandem with his disability.  (*Id.*)  But the IDEA mandates only that students be educated in a manner that addresses the unique needs arising from their disability; it does not require schools to "maximize the potential of handicapped children."  *C.K.*, 2023 WL 6158699, at *6 ("The SRO also considered the testimony that A.K.'s intellectual giftedness in certain subjects can lead to frustration and other emotional turmoil for the child.  Although this might suggest [the student] was not progressing in light of his full potential, the District was not required to maximize this potential . . . ."); *see R.C. ex rel. M.C.*, 906 F. Supp. 2d at 273 ("While it is natural to assume that a student would benefit from being in a smaller classroom environment with more support, the IDEA does not require that the District provide an ideal learning environment, but instead only one where the student can progress.").

Given the SRO's detailed explanation as to why the weight of the evidence favored the District despite the IHO's finding that a general education environment was inappropriate, the

44

Court defers to the SRO's decision. *See R.C. ex rel. M.C.*, 906 F. Supp. 2d at 273 ("[W]here the SRO has articulated specific reasons for his decision to adopt a different educational policy than the IHO, deference is particularly appropriate."); *see also Melendez v. Banks*, No. 21-CV-1243, 2023 WL 6283108, at *7 (E.D.N.Y. Sept. 26, 2023) ("Where the IHO and SRO disagree, reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO as the final state administrative determination."), *reconsideration denied*, 2024 WL 4600125 (E.D.N.Y. Feb. 29, 2024), *appeal withdrawn*, No. 23-7606, 2024 WL 4746264 (2d Cir. May 10, 2024).

### D.    **2023-2024 IEP**

#### 1.    **2023-2024 Annual Goals**

The last IEP at issue, developed for the 2023-2024 school year, contained the following social/emotional/behavioral goals:  (1) "When presented with a real or hypothetical situation, the student will identify at least two explanations or interpretations of the other person's behavior;" and (2) "The student will identify the appropriate Interpersonal Effectiveness Skill (GIVE, DEARMAN, FAST, THINK) he can use to interact with peers based on his goal for the social interaction."  (DE 76; Ps' 56.1 ¶ 75.)  These goals were developed to measure K.S.'s progress in the areas identified as requiring individual counseling, including his need to further "improve interpersonal effectiveness skills," "maintain and develop peer relationships," and "understand and identify alternate perspectives and reasons for people's actions."  (DE 74.).

The IHO concluded that these goals were insufficient to address K.S.'s "identified needs in social skills, social language and his sense of self-worth."  (I 39.).  The IHO relied on the FlexSchool's founder's testimony that these goals were not appropriate for K.S. because they

45

"d[id] not address his underlying issues, and he did not yet have the skills to meet the goals." (I 37 (citing Tr. at 785:5-787:22).)  The IHO also noted that the goals were rooted in DBT, and that K.S. already had learned the relevant DBT skills in middle school.  (I 38.)

The SRO reached the opposite conclusion.  (SD 30-31.)  The SRO relied on testimony from the school psychologist that carrying over the first goal, which was also included in the 2022-2023 IEP, was appropriate based on K.S.'s psychoeducational evaluation and his continued social struggles.  (SD 30 (citing Tr. at 445:15-23).)  The SRO also concluded, based on the school psychologist's testimony, that the second goal was an appropriate addition because it "addressed targeting interpersonal effectiveness" and K.S.'s "difficulties in that area."  (*Id.*)

In reaching this conclusion, the SRO did not expressly address the FlexSchool founder's testimony that the goals were inappropriate, on which the IHO relied in rejecting the annual goals.  Nonetheless, given that the SRO addressed the annual goals and found, based on evidence in the record, that they satisfactorily addressed K.S.'s interpersonal deficits, the SRO's decision is entitled to deference.  *See R.C. ex rel. M.C.*, 906 F. Supp. 2d at 271-72  (even though SRO did not specifically address plaintiffs' contentions regarding adequacy of goals, evidence did not show IEP's goals were inadequate where SRO explained the goals that IEP recommended and found them sufficient); *see also G.W. v. Rye City Sch. Dist.*, No. 11-CV-8208, 2013 WL 1286154, at *24 (S.D.N.Y. Mar. 29, 2013) ("[E]ven if the SRO gave greater weight to the District's experts, a court cannot choose between the competing views of experts on matters of educational policy or substitute its own judgment for that of the hearing officers which it reviews."), *aff'd*, 554 F. App'x 56 (2d Cir. 2014) (summary order).[15]

---

[15] Plaintiffs also argue that the SRO's decision "largely ignores the testimony of Plaintiffs' witnesses," (ECF No. 48 ("Ps' Reply") at 2), and "cites only evidence offered by the District," (SAC ¶ 85).  As an initial matter, various exhibits, while introduced by the District,

In particular, the SRO found that the first goal was carried over from the prior year because the high school psychologist "wanted to continue to work on [K.S.]'s social struggles" in light of his updated testing.  (SD 30.)  The fact that this goal was identical to a goal in an earlier IEP does not necessarily render it inadequate, as "[w]here a student's needs and objectives remain substantially the same, it is especially sensible that an IEP would reflect continuity with a student's needs and objectives as of previous years."  *P.C.*, 232 F. Supp. 3d at 415; *see J.C.S. ex rel. J.S.*, 2013 WL 3975942, at *11 ("[I]n light of [the student's] needs remaining substantially the same, the CSE's decision to draw from the prior IEP did not result in the denial of a FAPE.").

The SRO noted that the added goal was further designed to address K.S.'s social struggles by targeting interpersonal effectiveness.  (SD 30 (citing Tr. at 445:24-446:7).)  And while the IHO concluded that this interpersonal skills goal was inappropriate because it related to DBT skills, which K.S. had already learned in prior years, (*see* I 38), the SRO had already concluded in the discussion of the prior IEP that K.S. had made demonstrable progress in his social skills under the TSP program, as discussed above.  Thus, it was not unreasonable to continue focusing on DBT skills in individual counseling – particularly given the increased

---

contain information provided by the Parents.  For example, the IEPs contain summaries of the concerns the parents raised at each CSE meeting and the reports received from their private providers.  Other exhibits considered by the SRO included letters from K.S.'s private providers that were, like the IEPs, offered into evidence by the District.  (*See, e.g.*, SD 22 n.21, 26-27.)  Use of such exhibits does not suggest bias in favor of the District.  Moreover, the SRO's opinion contains numerous citations to Plaintiffs' exhibits and the testimony of K.S.'s parents and private providers.  (*See, e.g.*, SD 17 n.14, 18 n.16, 19, 21 n.19, 26, 28.)  It is not clear what evidence the parents contend that the SRO overlooked.  Thus, given that the SRO's decision was supported by the evidence, it is not the Court's role to question the SRO's ultimate determination that the record, as a whole, favored the District.  *See McCallion*, 2013 WL 237846, at *10 (rejecting argument that "SRO erred by relying too heavily on the evaluations and opinions of the District's witnesses while giving little or no weight to the conclusions of Parent's experts").

frequency of individual counseling sessions, as discussed below – and to include annual goals measuring K.S.'s progress in his ability to apply these skills independently.  The Court thus defers to the SRO's finding that these annual goals were appropriate.

### 2.      Supports Offered in the 2023-2024 IEP

Finally, Plaintiffs ask the Court to overturn the SRO's finding that the supports offered in the 2023-2024 IEP were inadequate to provide K.S. a FAPE.  These supports included the special class at an even smaller student ratio (12:1+1) twice daily for forty minutes; daily (rather than weekly) individual counseling; monthly parent counseling and training; indirect consultant teacher services for three hours per day; monthly observation by and consultation with the expert on twice exceptionality; and mandated meetings between K.S.'s teachers and support staff to monitor and discuss his progress.  (DE 67-70, 78-79.)

Although the IHO conceded that the 2023-2024 IEP included a "plethora of new services" and was designed to support K.S. in his transition back to the District, the IHO nonetheless found it insufficient, noting that the "section on social development contains little current information regarding his relationships with peers and adults, feelings about his self and social adjustment to school and community environments;" that it was "unclear" how the added special class period would benefit K.S. "other than to give him a break from regular education courses;" that the consultant teacher services were merely an "indirect service" that "would not provide [K.S.] any direct assistance in developing the social pragmatic skills he required;" and that "[t]he IEP failed to include any group counseling or social skills group to assist the student in developing those skills."  (I 38-39.)

The SRO, however, found that "[t]he increased academic supports, counseling services, consultations, and accommodations comprised appropriate programming to address the student's

unique needs." (SD 32.) In so finding, the SRO described each of the added supports, as well as testimony from the school's Assistant Superintendent for Student Support Services that these supports were designed to address the concerns shared by K.S.'s parents, the challenges involved in the transition back to the District, and K.S.'s distinct needs as a twice-exceptional student. (SD 31-32; Tr. at 515:8-516:11, 517:9-16, 521:8-523:15.)

At bottom, the SRO concluded, "the crux of the dispute" was that the parents felt K.S. needed to be in a setting with other twice-exceptional students, while the CSE's opinion was that K.S. "could receive meaningful educational benefit while attending a general education class placement with support of the TSP that provided counseling services, academic supports, and accommodations within a district public school." (SD 32.) The SRO determined that, contrary to the IHO's findings, the supports offered by the District were "'reasonably calculated' to provide meaningful educational benefit" to K.S., even if his parents would have preferred a different environment. (*Id.*) Because the dispute thus rests on a disagreement between the IHO and the SRO on educational policy, the Court must defer to the holding of the SRO. *See J.A.*, 2012 WL 1075843, at *10 ("The Court . . . is in no position to second-guess the SRO's expert determination of specialized questions concerning the [student's] educational needs and the adequacy of the IEP in addressing those needs."); *see also B.M.*, 2021 WL 4392281, at *17-19 (rejecting parents' argument that IEP was "not specifically tailored to the Student's ASD, disruptive mood disorder, heightened levels of anxiety surrounding school and peer interaction, and social pragmatic deficits" where SRO determined, contrary to IHO's conclusion, that student's needs "were incorporated into and addressed by" the IEP, even where supports in IEP fell short of those recommended by student's private providers).

49

**E.     Non-IDEA Claims**

In addition to their IDEA claims, Plaintiffs also assert claims under New York state law, 42 U.S.C. § 1983, § 504 of the Rehabilitation Act of 1973, and Title II of the ADA.  Judgment for Defendants is warranted on these claims as well.

First, Plaintiffs do not even address Defendants' arguments urging dismissal of their state law or § 1983 claims.[16]  These claims are thus deemed abandoned.  *See Hammer v. Town of Bedford*, No. 25-CV-2618, 2026 WL 100793, at *4 (S.D.N.Y. Jan. 13, 2026) (collecting cases), *appeal filed*, No. 26-162 (2d Cir. Jan. 27, 2026); *Nowak v. City of Yonkers*, No. 23-CV-10972, 2025 WL 863665, at *3 (S.D.N.Y. Mar. 19, 2025) ("Where a party is represented, a court may, when appropriate, infer from that party's partial opposition that relevant claims or defenses that are not defended have been abandoned.").

Further, in support of their RA and ADA claims, Plaintiffs merely incorporate the factual allegations underlying their IDEA claim and add conclusory allegations that the District discriminated against K.S. by denying him reasonable accommodations and not offering appropriate services and supports.  (*See* SAC ¶¶ 138-49.)  Given that these additional claims are derivative of Plaintiffs' IDEA claims, dismissal is warranted for the same reasons applicable to the IDEA claims.  *See French v. N.Y. State Dep't of Educ.*, 476 F. App'x 468, 473 (2d Cir. 2011) (summary order) (dismissing ADA, Rehabilitation Act, state law, and § 1983 claims where alleged discrimination underlying such claims was merely "a rehashing of [plaintiff's] allegation that the defendants failed to provide her with a FAPE"); *B.D. v. Eldred Cent. Sch. Dist.*, 661 F. Supp. 3d 299, 321 (S.D.N.Y. 2023) ("[W]hen based on the same core set of underlying facts,

---

[16] Nor do Plaintiffs respond to Defendants' argument that no claims lie against Defendant Blanch in his official capacity.

claims made under [New York Education Law, the ADA and the RA] are generally derivative of IDEA."); *Maus v. Wappingers Cent. Sch. Dist.*, 688 F. Supp. 2d 282, 302 (S.D.N.Y. 2010) (finding dismissal of RA and ADA claims appropriate because they were "merely restatements of [plaintiffs'] IDEA claims").

\* \* \*

The Court understands why the Parents prefer the Student's placement at the FlexSchool, even though – like the Parents, (DE 28, 40) – it believes the District made admirable efforts to assist a gifted and yet troubled child. The Court also understands why the stress the Student experienced in the public school was painful for him and the Parents. But the Court's role is limited. It cannot order tuition reimbursement based on what it would have wanted if it were the Student's parent, or even on what it thinks the District should have concluded. It must be mindful of its lack of expertise in educational matters and is obliged to defer to the conclusions of the SRO where, as here, they are adequately reasoned, particularly as they address the substantive adequacy of an IEP.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is denied, and Defendants' motion for summary judgment is granted. The Clerk of Court is respectfully requested to terminate the pending motions, (ECF Nos. 24, 42), enter judgment for Defendants, and close the case.

**SO ORDERED.**

Dated:  February 9, 2026
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.